IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| USCONNECT, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25CV692 |
| | ) | |
| VENDORS EXCHANGE | ) | |
| INTERNATIONAL, INC. and | ) | |
| VENDORS EXCHANGE | ) | |
| INTERNATIONAL, LLC, d/b/a | ) | |
| VE SOLUTIONS, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

The plaintiff, USConnect, LLC ("USConnect"), and the defendant, Vendors Exchange International, Inc. ("Vendors Exchange"), had a fruitful business partnership for several years in the vending services industry. That relationship then soured. Broadly, USConnect alleges that Vendors Exchange misappropriated USConnect's confidential information to create and sell its own products, giving rise to claims of breach of contract (Count One), contractual indemnification (Count Two), misappropriation of trade secrets under North Carolina and federal law (Counts Three and Four respectively), passing off in violation of the Lanham Act (Count Five), common law unfair competition (Count Six), unfair and deceptive trade practices under North

Carolina law (Count Seven), and unjust enrichment (Count Eight).

Before the Court is the defendants' Motion to Dismiss Counts Three through Eight.

On March 9, 2026, this Court recommended dismissal of a number of USConnect's claims, including its unfair and deceptive business practices claims and Lanham Act reverse passing off claim. *See* Mem. Op. & R. & R. of U.S. Mag. Judge, Docket Entry 22. USConnect objected, directing the Court's attention to case law at odds with the unfair and deceptive business practices determination. The Court has considered the parties' arguments and hereby withdraws the March 9,

2026 Memorandum Opinion and Recommended Ruling.

Because USConnect has pled facts sufficient to support the claims alleged in Counts Three and Four and Six through Eight, the Court should deny the motion as to those counts. Because USConnect has not pled facts establishing that it was the origin of the goods central to its Lanham Act passing off claim, the Court should grant the motion as to Count Five.

## I. FACTS

Because all well-pled facts are accepted as true and considered in the light most favorable to the plaintiff, below are the facts as USConnect has alleged in the Complaint, Docket Entry 3. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255 (4th Cir. 2009) (citation modified).

"For more than a decade, USConnect developed and refined a business model and internet network system to link thousands of internet-enabled vending machines, micro-market kiosks, and other point-of-sale ('POS') devices . . . (the 'USConnect Network')." Compl. ¶ 14. USConnect's Affiliates own the vending machines and kiosks. *Id.* ¶ 16. Customers of these Affiliates and end-use-consumers use a USConnect Account, "enabled through a unique USConnect Card or an online downloadable application (or 'app')," to "facilitate vending telemetry and cashless payment systems through a

suite of technology features that include credit/debit card processing, hosted balance cards, consumer engagement services, product promotions[,] and consumer loyalty programs ('USConnect Technology') that are available as part of the USConnect Network ('the USConnect System')." *Id.* ¶ 15. This System "allows users to access and make purchases from internet-enabled vending machines and micro-market kiosks that contain within them the applications that enable and enhance the user's interface experience . . . ." *Id.* ¶ 16. Users "interfac[e] with text, graphics, artwork, logos[,] and trademarks (the 'USConnect Intellectual Property and Content')." *Id.*

USConnect "maintains a consumer loyalty program (the 'Loyalty Program')" "[a]s part of US Connect Technology within the USConnect System." *Id.* ¶ 17. This Loyalty Program "enables consumers to earn loyalty points that can then be redeemed for various rewards . . . ." *Id.* The "availability of these programs increases sales" because the "Loyalty Program is a significant driver of repeat business for the Affiliates." *Id.* "Through the USConnect Intellectual Property and Content, the kiosk interfaces with the USConnect Account" to reduce the user's Account balance while increasing the user's loyalty points in the Loyalty Program. *Id.* ¶ 18. "The USConnect Intellectual Property and Content also enables the end-user to

reload the USConnect Account with funds . . . ." *Id.*

USConnect was interested in "develop[ing] more advanced kiosks that could use the USConnect Intellectual Property and Content on and as part of the USConnect System" so it began vetting manufacturers in 2017. *Id.* ¶ 20. One of those manufacturers was Vendors Exchange which, at the time, "designed and manufactured kiosks for use in unattended retail situations, like micro-markets in employee breakrooms," but "those kiosks were very basic in their technology-related features." *Id.* ¶¶ 21–22. "The kiosks were not user-friendly, had no ability to track any type of loyalty rewards program, and could not handle declining balance requirements." *Id.* ¶ 22.

In April 2017, USConnect and Vendors Exchange entered into a Confidentiality Agreement ("NDA") "pursuant to which Vendors Exchange agreed to maintain the confidentiality of USConnect's confidential and proprietary information" including, but not limited to, "its business methods, supplier relationship, membership relationships, technology systems, user experience, proprietary APIs, trade secrets, customer lists, and specifications . . . ." *Id.* ¶ 23. Vendors Exchange also agreed "that it would not use such information to develop

any competitive program, product[,] or process." *Id.*

After further negotiations, the parties entered into a Master Services Agreement ("MSA") in November 2018, pursuant to which USConnect would afford Vendors Exchange "full access to USConnect Intellectual Property and Content" so that Vendors Exchange could "develop (at USConnect's directions and specifications) and manufacture kiosks that contained and were based on the USConnect Intellectual Property and Content for use on and as part of the USConnect System." *Id.* ¶¶ 24–25.

Under the MSA, "USConnect retained Vendors Exchange to aid in the development, manufacture[,] and sale of such Integrated Products [that were based on and contained the USConnect IP and designs as well as Vendors Exchange's software written to USConnect's specifications] to the Affiliates." *Id.* ¶ 25.

While "USConnect continued to own all right, title[,] and interest in and to the USConnect IP," it "granted Vendors Exchange . . . a non-exclusive license to use the USConnect IP solely for purposes of fulfilling its obligations under the MSA for the life of the MSA. *Id.* ¶¶ 26–27. In return, Vendors Exchange "expressly agreed that it would not" do a litany of things such as use or modify "any portion of the USConnect IP separately from the Integrated Products," "[u]se the USConnect IP in any manner except

3

as permitted by the MSA," "[c]reate derivative works based on the USConnect IP," or "[a]ccess the USConnect's IP to [] build a competitive product." *Id.* ¶ 28.

Pursuant to the MSA, Vendors Exchange was to "manufacture and sell the Integrated Products exclusively for and to USConnect and its Affiliates." *Id.* ¶ 30. And "the Integrated Products would bear various USConnect trademarks on the screens . . . ." *Id.* Furthermore, "each party was precluded from divulging the other party's 'Confidential Information' to any third party." *Id.* ¶ 31.

In February 2020, the parties entered into an Amended MSA to include "USConnect's Loyalty Programs Bistro to Go!/My Vending Rewards" in "the USConnect IP" and add them "to the Integrated Products that Vendors Exchange was to develop, manufacture[,] and sell to the USConnect Affiliates." *Id.* ¶¶ 35–36.

"As part of the development process, and pursuant to the NDA, MSA[,] and [Amended] MSA . . ., USConnect shared highly sensitive confidential and propriety information with Vendors Exchange." *Id.* ¶ 34. This "USConnect Confidential Information" included, but was not limited to, "the underlying requirements of the full suite of technical services and other account service products that USConnect offers its customers," "descriptions, design specifications[,] and

functionality for the consumer kiosk interfaces and interface features (including, for example, quick checkout or Scan-N-Go)," "customer lists, customer contacts, customer locations, particularities of the customer's business (including size, number of kiosks, kiosk serial numbers[,] and purchasing potential), [and] potential customers," and the "loyalty rewards system business model, including details regarding process rates, flow of funds, redemption protocol, assignment percentages, data flow, micro-market vending characteristics, scan and go functionality, and system architecture and connectivity." *Id.*

USConnect considers the USConnect Confidential Information to be trade secrets that give it "a unique competitive advantage in the marketplace" and which USConnect treats "as confidential," and which "is not generally known by USConnect competitors." *Id.* ¶ 40. "[T]o maintain the confidential nature of the information[,]" "the information is subject to confidentiality provisions set forth in [] Agreements," it is "password-protected" with access limited to "employees that have a need to access the information in order to perform his/her job," and, if shared with vendors or suppliers, is first protected by third-party non-disclosure agreements. *Id.* ¶ 41.

Despite its agreement with USConnect, "upon [USConnect's] information and belief, in or around

4

2023, Vendors Exchange began working with [Vendors Exchange International, LLC d/b/a VE Solutions ('VE Solutions')] to develop its own competitive loyalty program and declining balance program to incorporate into a competing kiosk that they could take directly to market." *Id*. ¶ 43. The use of USConnect's IP and the USConnect Confidential Information "accelerate[d] the process for developing a fully functioning kiosk that contained many of the features of the Integrated Products which they could then take to market." *Id*. ¶ 47.

Indeed, "[t]hese efforts eventually led to the VE Product." *Id*. ¶ 43. "The VE Product contained or was otherwise based on or derived from the USConnect IP and the USConnect Confidential Information and included many of the features, functions[,] and graphics of the Integrated Products." *Id*. ¶ 44. "[A]spects" of the VE Product's "user interface screens" either "duplicate or are substantially similar to those of the Integrated Products." *Id*. ¶ 45.

"The VE Product also incorporated a loyalty and declining balance program that was developed based on, derived from, and/or that otherwise utilized the USConnect IP and the USConnect Confidential Information." *Id*. ¶ 46; *see also id*. ¶ 48. In addition, the VE Product has USConnect's "unique" "'Promotions' program [that] enables the kiosk to create, recognize[,] and account for promotions offered to the customer

while properly recording such entries in the customer's account." *Id*. ¶ 51. It also includes USConnect's "unique" 'Scan-N-Go' program' . . . that enabled the kiosk to recognize the difference between a barcode on merchandize [sic] and the barcode on the USConnect Card, thereby enabling the consumer to simply scan the barcode of each item to complete a purchase without having to touch the touchscreen . . . ." *Id*.

"Prior to being exposed to and having access to USConnect IP and the USConnect Confidential Information, Vendors Exchange was unable to create the loyalty programs or the declining balance programs for use with their rudimentary kiosks in the manner or in the way that the USConnect Network handles such programs." *Id*. ¶ 49. "[U]pon [USConnect's] information and belief, had [the defendants] not used the USConnect IP and the USConnect Confidential Information, it would have taken [them] much longer and been more expensive to create the VE Product with the functions and features that it currently has . . . ." *Id*. ¶ 50.

While developing the VE Product, VE Solutions "registered a fictitious name, 'VE Solutions,'" after which the defendants "began creating marks and logos for 'VE Solutions' that would distinguish the Vendors Exchange brand from USConnect." *Id*. ¶ 54. Although the Amended MSA required Vendors Exchange "to implement the design of the images

dictated by USConnect [including USConnect's marks, logos[,] and trademarks] into the Integrated Product's user interface screens[,]" in 2024 the defendants "began replacing the USConnect images on the Integrated Product's user interface screens with the marks and logos of VE Solutions." *Id.* ¶¶ 55–56. "[U]pon [USConnect's] information and belief," the defendants "hoped . . . that consumers would associate Integrated Products with VE Solutions such that, when [the defendants] began to roll out their VE Product with a user interface screen that had images and marks of VE Solutions, the VE Product would seamlessly be accepted by the vending market. *Id.* ¶ 59.

The Amended MSA was set to expire in November 2024. *Id.* ¶ 60. In the meantime, "Vendors Exchange made it appear that it intended to renew the MSA" and, in the spring of that year, "engaged in discussions with USConnect about extending the MSA for another four[-]year term." *Id.* ¶¶ 60–61. However, "[w]hile these discussions were ongoing, [the defendants] were in the final stages of integrating numerous programs" into the VE Product and "devis[ing] a plan to market and sell the VE Product directly to USConnect's Affiliates." *Id.* ¶ 62. Indeed, "[i]n the Summer of 2024, using USConnect's Affiliate list, Vendors Exchange approached at least one . . . USConnect Affiliate and offered to sell them the VE Product" that "would not be connected to the USConnect Network but would offer

similar loyalty programs and other features/programs that were then[] offered by USConnect within the Integrated Product." *Id.* ¶ 64.

USConnect's Chief Executive Officer contacted the defendants' President who "admitted that [the defendants] had developed the VE Product and that, in doing so and by its actions, Vendors Exchange had breached the MSA." *Id.* ¶¶ 66–67. But he "denied that the VE Product used, contained[,] or was developed with the USConnect IP or the USConnect Confidential Information." *Id.* ¶ 68.

Pursuant to the terms of the Amended MSA, "[t]he parties met in Greensboro, North Carolina," and the defendants' President "made it clear that [the defendants] intended to compete directly against USConnect with their VE Product." *Id.* ¶¶ 69–70. Although he earlier admitted that the defendants approached an Affiliate, he now "claimed the Affiliate was lying." *Id.* ¶ 70.

The Amended MSA expired in November 2024 and, along with it, Vendors Exchange's license to use USConnect's IP. *Id.* ¶ 72. But Vendors Exchange "continued to market and sell the VE Product which, upon [USConnect's] information and belief, incorporates or is otherwise based on/derived from the USConnect IP and USConnect Confidential Information." *Id.* ¶ 73; *see also id.* ¶ 75. "Upon [USConnect's] information and belief, [the defendants] have generated

Case 1:25-cv-00692-LAF-JGM   Document 29   Filed 05/22/26   Page 6 of 23

thousands of dollars of profits from the sale, rental and/or lease of the VE Product." *Id.* ¶ 76.

## II. PROCEDURAL POSTURE

On June 27, 2025, USConnect filed suit against the defendants in Guilford County Superior Court. *See* Compl. The Complaint alleges claims of breach of contract, contractual indemnification, misappropriation of trade secrets under state and federal law, passing off, unfair competition, unfair and deceptive trade practices, unjust enrichment, and breach of implied covenant of good faith and fair dealing. *See generally id.*

The defendants removed the case to federal court on July 30, 2025, Docket Entry 1, and moved one week later to dismiss six of USConnect's claims, *see* Docket Entry 9.

Specifically, the defendants move to dismiss for failure to state a claim as to Counts Three and Four alleging misappropriation of trade secrets, Count Five alleging passing off, Count Six alleging unfair competition, Count Seven alleging unfair and deceptive trade practices, and Count Eight alleging unjust enrichment. *See id.*

## III. DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Legal conclusions "must be supported by factual allegations" that amount to more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). A plaintiff is not required to prove its case in the complaint, *see, e.g.*, *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 291 (4th Cir. 2012); *Scott v. City of Durham*, 2021 WL 3856168, at *2 (M.D.N.C. August 27, 2021), but the complaint's allegations should "allow the court to draw a reasonable inference that the defendant is liable for the misconduct alleged," *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (cleaned up).

On a motion to dismiss, courts view the allegations in the complaint as true, drawing all inferences in the plaintiff's favor. *See Twombly*, 550 at 555–56 (2007); *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023). But courts are not required to "accept as true 'legal conclusions drawn from the facts' or any other 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

7

A. USConnect has sufficiently alleged misappropriation of trade secrets.

USConnect alleges that the defendants misappropriated its trade secrets by using them without authorization in the VE Product, in violation of North Carolina General Statutes § 66-152, *et seq.* (North Carolina Trade Secrets Protection Act, "NCTSPA") and 18 U.S.C. § 1836(b) (Defend Trade Secrets Act of 2016, "DTSA"). *See* Compl. ¶¶ 91-108 (Counts Three and Four).

The defendants argue that pleading misappropriation of trade secrets requires more specificity under Rule 8 and USConnect's allegations lack that requisite specificity and otherwise fail to state a claim. *See* Defs.' Am. Br. in Supp. of Mot. to Dismiss at 11–20, Docket Entry 11 ("Am. Br. in Supp."). USConnect disagrees, argues that there is no applicable heightened pleading standard, and contends that it has sufficiently pled misappropriation of trade secrets. *See* Pl. USConnect's Resp. in Opp'n to Defs.' Mot. to Dismiss at 6–15, Docket Entry 17 ("Resp. Br.").

A claim for a violation of the NCTSPA and DTSA requires that the defendant "knew or should have known of the trade secret" and "had a specific opportunity to acquire it for disclosure or use, or has acquired, disclosed, or used it without the express or implied consent or authority of" the plaintiff. *RF Micro Devices, Inc. v. Xiang*, No.

1:12CV967, 2016 WL 3892416, at *3 (M.D.N.C. July 14, 2016). Both statutes "define a trade secret in substantially the same terms[,]" as well. *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025). A trade secret is information for which a business uses "reasonable measures to keep" secret and from which a business "derives independent economic value[.]" *Id.* (citations omitted).

As is especially relevant here, the Fourth Circuit Court of Appeals has explained that "[t]he federal and North Carolina statutes are similar in another way: both require the plaintiff to identify with sufficient particularity the trade secret it claims has been misappropriated." *Id.* (citations omitted). "At the pleading stage, identifying the trade secret with sufficient particularity means describing the trade secret at a level of detail that enables a defendant to delineate that which he is accused of misappropriating . . . and that enables a court to determine whether the plaintiff has plausibly satisfied the reasonable secrecy and independent economic value requirements." *Id.* (internal citations omitted).

For example, in *Sysco Machinery Corporation*, Sysco defined its trade secrets as "'Sysco's compilation of machinery, software, and confidential information,'" "'Sysco's proprietary and confidential Information, including the Copyrighted Works, and technical, financial, operations, strategic planning, product, pricing

8

vendor, and customer information,'" and "'the technical documents, test videos, statistical data, client contracts, and other confidential information used by Sysco to develop and manufacture' rotary die cutting machines." *Id.* at 228–29 (quoting the complaint). Essentially, Sysco was "suggest[ing] that nearly [its] entire business [was] a trade secret." *Id.* at 229.

As a result, the Court explained, "it is impossible for DCS to know what it has been accused of misappropriating or for the court to assess whether Sysco has met the reasonable secrecy and independent economic value requirements." *Id.*

Courts have found the following trade secret pleadings insufficient:

- "specialized marketing strategies and materials" and "Brand Standards Manual" without further factual allegations, *see Willett v. Window Gant, LLC*, No. 3:25-cv-00044, 2026 WL 575903, at *7 (W.D. Va. Mar. 2, 2026);

- "business and technical information, including but not limited to formulas, patterns, programs, devices, compilations of information,

methods, techniques, and processes from which Plaintiffs derive actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by a persons who can otherwise obtain economic value from its disclosure or use" and "confidential and valuable technical knowledge, engineering specifications, market knowledge, and intellectual and practical knowhow relating to, developed for, and necessary for the design and construction of cabinetry, such cabinetry used, in particular in higher-end residences,"[1] *see Design Gaps, Inc. v. Hall*, No. 3:23-cv-186-MDC, 2023 WL 8103156, at *9 (W.D.N.C. Nov. 21, 2023);

- "proprietary training, PHS's proprietary practices, methods, techniques, and pricing models, confidential customer databases, including the entire PHS's SalesForce database, and PHS proprietary quote software, confidential sales memos, sales training manuals, and information concerning PHS's relationship with its

---

[1] The plaintiff also alleged that its trade secrets included "product sources, products, price lists, advertising plans, designs and materials, technical drawings," and more, but the court found this definition failed because these

alleged trade secrets "primarily refer[red] to knowledge Hall would have gained while working for Plaintiffs." *Design Gaps, Inc.*, 2023 WL 8103156, at *10. Such knowledge of an employee is not a trade secret. *Id.* (citing cases).

suppliers and vendors" without "specific information about the unique nature of its customer identification and targeted marketing practices, including how this information is developed, ascertained, and protected," *see Power Home Solar, LLC v. Sigora Solar, LLC*, No. 3:20-cv-00042, 2021 WL 3856459, at *10 (W.D. Va. Aug. 30, 2021); and

- "the 'structure and design of the Ventures VRX Simulators' that are the 'subject of pending patent applications'," *VRX USA, LLC v. VRX Ventures, Ltd.*, No. 3:20CV409-GCM, 2020 WL 7229672, at *7 (W.D.N.C. Dec. 8, 2020).

On the other hand, courts have deemed the following trade secret allegations sufficient:

- "flat-rate job pricing formula" and "lead-tracking system, including leads from the call center" where the plaintiff further defined the flat-rate pricing formula as "provid[ing] larger profit margins than jobs done on a T&M (time and materials) basis," *see Willett*, 2026 WL 575903, at *7;

- "business methods, techniques, processes, . . . lists of actual or potential customers or suppliers[,] . . . key account contacts and customer lists, insurance requirements and

confidential service agreements between the previous business owner and customers, and pricing templates," *see Omni Logistics, LLC v. Wells*, No. 1:25-cv-00023-MR-WCM, 2025 WL 4036404, at *3 (W.D.N.C. Dec. 22, 2025), *adopted*, 2026 WL 95428 (W.D.N.C. Jan. 13, 2026);

- "financial business, scientific, technical and engineering information, client lists, and vendor lists," *see Townsend v. Advanced Energy Machs., LLC*, No. 24-cv-2520-ABA, 2025 WL 2659834, at *6 (D. Md. Aug. 29, 2025); and

- the plaintiff's "business model and the development and processing of certain SAP Products, including Plaintiff's pricing and Financials for those products, and 'customers' technical specifications'" because "[b]ased on the alleged relationship between Plaintiff and [one of the defendants,] Barefoot, and the subsequent involvement between [the two defendants], the . . . Plaintiff's identification of the claimed trade secrets enables Defendants to delineate what they are accused of misappropriating," *see Chase Corp. v. Barefoot*, No. 1:24CV351, 2025 WL 641932, at *11 (M.D.N.C. Feb. 27, 2025), *adopted*, 2025 WL 969359 (Mar. 31, 2025).

10

Here, USConnect's allegations are more akin to those in *Omni Logistics, LLC*, *Townsend*, and *Chase Corporation* where the courts found the trade secret allegations sufficiently particular, especially when read in the context of USConnect's other allegations. USConnect alleges that the USConnect Confidential Information are trade secrets. *See* Compl. ¶ 40. It then alleges that the defendants misappropriated at least a portion of the USConnect Confidential Information related to its loyalty rewards program: its "costs and pricing rates and structures for loyalty reward systems and kiosks[,]" its "customers and potential customers for loyalty reward systems and kiosks, including customer names, locations, contact information, size, number of kiosks, kiosk serial numbers[,] and purchasing potential[,]" and its "loyalty rewards system business model, including details regarding processing rates, flow of funds, redemption protocol, assignment percentages, data flow, micro-market vending characteristics, scan and go functionality, and system architecture and connectivity." *Id.* ¶¶ 94, 104.

Earlier in the Complaint, USConnect describes its Loyalty Program and how "the kiosk interfaces with the USConnect Account" as part of its Loyalty Program. *Id.* ¶¶ 17–19. Until it worked with USConnect, "Vendors Exchange was unable to create the loyalty programs or the declining balance programs for use with their

rudimentary kiosks in the manner or in the way that the USConnect Network handles such programs." *Id.* ¶ 49. But, once exposed to USConnect's protected information, the defendants developed the VE Product which incorporates "a loyalty and declining balance program" which is "an attempt to replicate the USConnect Network and the USConnect System" using protected information. *Id.* ¶ 46.

Despite their argument otherwise, the defendants can "delineate that which [they] are] accused of misappropriating," and the Court can assess whether USConnect has also alleged the secrecy and independent economic value of the trade secrets. *See Sysco Mach. Corp.*, 143 F.4th at 228.

The defendants also argue that some of the alleged trade secrets are not secret at all. This includes "cost and pricing information" and "customer information" that are "readily available to the public." Am. Br. in Supp. at 14–15. But USConnect's allegations are not so basic. A USConnect Affiliate may very well know how much it pays USConnect, but it would not necessarily know USConnect's "costs and pricing rates and structures for the loyalty reward systems and kiosks[.]" *See* Compl. ¶ 34. Similarly, while the identity of USConnect's existing customers may be public because they have a kiosk with USConnect's marks, other customer information such as customer "purchasing potential[]"

11

and "potential customers for loyalty rewards systems and kiosks" are not necessarily publicly available. *See id.*

Furthermore, USConnect alleges that its trade secrets are password-protected and only available to employees who require the information to perform their jobs, and third parties that receive protected information must enter into non-disclosure agreements. *Id.* ¶ 41. At least for this pleading stage, USConnect has sufficiently alleged that the information was confidential and it took reasonable measures to maintain its secrecy.

The defendants also challenge what they characterize as conclusory allegations that they misappropriated or used trade secrets. *See* Am. Br. in Supp. at 17.

The definitions of "misappropriation" in the DTSA and NCTSPA are "substantially identical." *Sysco Mach. Corp.*, 143 F.4th at 229. Those statutes instruct that "[m]isappropriation involves 'acquisition,' 'disclosure,' or 'use' of a trade secret by 'improper means' or without consent." *Id.* In other words, "'the core' of a misappropriation claim is a 'breach of a duty of trust or confidentiality.'" *Id.* (citation omitted). But "'[a]part from breach of contract, abuse of confidence[,] or impropriety in the means of procurement, trade secrets may be copied as freely as devices or processes which are not secret.'" *Id.* at 230 (quoting Restatement (First) of Torts § 757 cmt. a (Am. Law Inst. 1939)).

Relying on *Sysco Machinery Corporation*, the defendants contend that whatever trade secrets they are alleged to have used to develop the VE Product, "USConnect deliberately and voluntarily provided [those trade secrets] . . . to Vendors Exchange[] under the parties' agreement." Am. Br. in Supp. at 19. The problem in *Sysco Machinery Corporation* was Sysco's failure to "allege that, prior to the activity at issue, it ever informed [the defendant] that such information contained trade secrets" so the "information [the defendant] possessed about Sysco appear[ed] to have been acquired lawfully as part of the parties' ordinary manufacturer-distributor relationship." *Id.*

Those facts thus differ from the ones USConnect alleges. USConnect only disclosed its trade secrets to Vendors Exchange because Vendors Exchange entered into the NDA, MSA, and Amended MSA and legally bound itself to the terms of those agreements, including maintaining the "confidentiality of . . . trade secrets[.]" Compl. ¶23. USConnect explicitly alleges that it "shared highly sensitive confidential and propriety information [that included the trade secrets identified in Counts Three and Four] with Vendors Exchange" "*pursuant to the NDA, MSA[,] and MSA as amended . . . .*" *Id.* ¶ 34 (emphasis added).

USConnect also sufficiently alleges that the defendants misappropriated or used the trade secrets to develop the VE Product as a competitor to the Integrated Product. As alleged, the defendants necessarily employed USConnect's trade secrets to create and execute the VE Product because Vendors Exchange was otherwise incapable of doing so on its own.

At this stage of litigation, USConnect has sufficiently alleged that the defendants misappropriated its trade secrets in violation of North Carolina and federal law. The Court should deny the defendants' motion to dismiss Counts Three and Four.

> B. USConnect's "reverse passing off" claim fails as a matter of law.

USConnect alleges that the defendants' removal of USConnect's trademark images on the Integrated Product's user screen and replacement with the VE Solutions trademark violated the Lanham Act, 15 U.S.C. § 1125, *et seq.* Compl. ¶¶ 110–115.

"While much of the Lanham Act addresses the registration, use, and infringement of trademarks and related marks, § 43(a) . . . goes beyond trademark protection." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28–29 (2003), *quoted in Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016). "Written in terms of the putative defendant's conduct, § 43(a)

sets forth unfair competition causes of action for false association and false advertising . . . ." *Belmora LLC*, 819 F.3d at 706.

In this case, USConnect has alleged "'reverse passing off,' which occurs when a 'producer misrepresents someone else's goods or services as his own.'" *Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 438 (4th Cir. 2010) (quoting *Dastar Corp.*, 539 U.S. at 28 n.1).

Reverse passing off "occurs when either (1) 'the wrong doer [sic] removes the name or trademark on another party's product and sells that product under a name chosen by the wrongdoer' or (2) 'the wrongdoer . . . removes or otherwise obliterates the name of the manufacturer or source and sells the product in an unbranded state.'" *Siler v. Lejarza*, 415 F. Supp. 3d 687, 699 (M.D.N.C. 2019) (quoting *Rutledge v. High Pt. Reg'l Health Sys.*, 558 F. Supp. 2d 611, 620 (M.D.N.C. 2008)).

To state a claim for reverse passing off, a plaintiff must sufficiently allege: "'(1) that the work at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin.'" *Id.* at 701 (quoting *Universal Furniture Int'l, Inc.*, 618 F.3d at 438).

Regarding the first element, "[i]f the defendant supplies a product it manufactured, even if copied from a competitor, a reverse passing off claim generally will not attach." *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1306 (D. Utah 2020). To that end, the Supreme Court has held that "[origin] refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Dastar Corp.*, 539 U.S. at 37. This is because the Lanham Act was "not designed to protect originality or creativity"—that is the province of copyright. *See id.*

The *Dastar Corp.* Court also recognized that "[t]he concept [of the origin of goods] might be stretched . . . to include not only the actual producer, but also the trademark owner who commissioned or assumed responsibility for ('stood behind') production of the physical product." *Id.* at 31-32. *See also DJ Direct, Inc. v. Margaliot*, 512 F. Supp. 3d 396, 415-17 (E.D.N.Y. 2021) (applying *Dastar Corp.* and *Universal Furniture Int'l, Inc.* and finding that the plaintiff established a likelihood of success (for purposes of an injunction) that it was the origin of the karaoke machines even though it did not manufacture the machines); *Universal Furniture Int'l, Inc.*, 618 F.3d at 424–25, 438 (applying *Dastar Corp.* and finding that the plaintiff was the origin of the furniture even though it did not manufacture the furniture).

Here, per the Complaint:

- Vendors Exchange "was to develop (at USConnect's directions and specifications) and manufacture kiosks that contained and were based on the USConnect Intellectual Property and Content for use on and as a part of the USConnect System," Compl. ¶ 24;
- "The Integrated Products were based on and contained the USConnect IP and designs as well as Vendors Exchange's software written to USConnect's specifications," *id.* ¶ 25;
- "USConnect granted Vendors Exchange a non-exclusive license to use the USConnect IP solely for purposes of fulfilling its obligations under the MSA for the life the of the MSA," *id.* ¶ 27;
- Vendors Exchange "manufacture[d] and s[old] the Integrated Products exclusively for and to USConnect and its Affiliates," *id.* ¶ 30; and
- "[T]he Integrated Product would bear various USConnect trademarks on the screens to designate to Affiliates and their customers that the Integrated Products were USConnect's kiosks operating on the USConnect System," *id.*

Thus, as to origin (as pled), the question is who is the origin of the Integrated Product from which

14

Vendors Exchange removed USConnect's images and replaced with VE Solutions' marks and logos? The answer is clear. Vendors Exchange is the origin of the Integrated Product. It manufactured the tangible product while USConnect contributed the intellectual property, and the Lanham Act does not protect such a contribution.

USConnect cites to *DJ Direct, Inc*, 512 F. Supp. 3d at 415 for the proposition that it, as the *commissioner* of the goods, originated them. *See* Resp. Br. at 16. But those facts are inapposite from the facts pled here. To that end, the district court's opinion in *Universal Furniture International, Inc. v. Collezione Europe USA, Inc.* is illustrative. *See* No. 1:04CV977, 2007 WL 2712926 (M.D.N.C. Sept. 14, 2007), *aff'd*, 618 F.3d 417. There, the court found that the plaintiff was the "origin" of a furniture line that the defendant passed off as its own even though the plaintiff did not manufacture the furniture itself.

> In this case, Plaintiff is not the actual manufacturer of the furniture in question, but can be viewed as its producer. Plaintiff's sister company, Lacquercraft, manufactures the EMC line exclusively for Plaintiff. Plaintiff, in turn, holds the copyrights for all the designs and manages and markets the furniture line. The badging and branding of the furniture is solely the responsibility of Plaintiff, and

all of the furniture in the EMC line is initially distributed through Plaintiff. Accordingly, Plaintiff is the producer of the EMC furniture line and will be considered the "origin" despite the fact that it is not the direct manufacturer.

*Id.* at *13.

The district court in *DJ Direct, Inc.* came to the same conclusion where the defendants passed off karaoke machines as their own that the plaintiff's supplier had manufactured.

> Although . . . Plaintiff's supplier manufactured the tangible goods offered for sale in this case, the fact that Plaintiff ordered the machines in question to be built to its specifications and to bear the KaraoKing mark, and that it provided customer service and support through its website . . . , supports the conclusion that Plaintiff commissioned the machines and stood behind their production. . . . Accordingly, because the Supreme Court has contemplated that the phrase "origin of goods" might be stretched to include the trademark owner who commissioned the goods and stood behind their production, Plaintiff has shown at least a serious question going to the merits on this point, if not a likelihood of success.

15

512 F. Supp. 3d at 415.

But those are not the facts alleged here. USConnect did not manufacture the Integrated Product. It contracted with Vendors Exchange to do so. In that relationship, USConnect provided Vendors Exchange with USConnect Intellectual Property and Content for use on and as a part of the USConnect System. Vendors Exchange then manufactured the Integrated Product which was based on and contained the USConnect Intellectual Property and designs as well as Vendors Exchange's software written to USConnect's specifications.

Although the *Dastar* Court recognized that "[t]he concept [of the origin of goods] *might be stretched . . . to include not only the actual producer, but also the trademark owner who commissioned or assumed responsibility for ('stood behind') production of the physical product,"* 539 U.S. at 32 (emphasis added), there is no need to do so to reach the facts of this case.

And USConnect cannot clear that origin hurdle with the conclusory, legal assertion in its Complaint, belied by its other facts pled, that the Integrated Products "originated with USConnect." *See* Resp. Br. at 17 (citing Compl. ¶¶ 55, 112). *See Just Puppies, Inc.*, 123 F.4th at 660 (explaining that courts are not required to "accept as true 'legal conclusions drawn from the facts' or any other 'unwarranted inferences,

unreasonable conclusions, or arguments'") (quoting *Giarratano*, 521 F.3d at 302).

The claim here is akin to a licensing misrepresentation, which courts have rejected as giving rise to a Lanham Act reverse passing off claim. For example, in *Micro/sys, Inc. v. DRS Technologies, Inc.*, No. CV 14-3441 DMG (CWX), 2015 WL 12748631, at *1 (C.D. Cal. Feb. 18, 2015), the district court dismissed such a claim where the defendant sold computer boards to the United States Postal Service that included an unlicensed version of the plaintiff's software. In so doing, the court noted that the "sole factual predicate for Micro/sys's Lanham Act claims is that DRS misrepresented to USPS that it had acquired all necessary rights to the XDOS software," which was insufficient as "false designation of origin or association." *See id*. at *3. *See also Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 307 (S.D.N.Y. 2011) (rejecting Lanham Act reverse passing off claim where the harm was misrepresentation of sourcing and authorship).

The allegations in the Complaint here are that Vendors Exchange "began creating marks and logos for 'VE Solutions' . . . ." Compl. ¶ 54. Then, "in 2024, [they] began replacing the USConnect images on the Integrated Product's user interface screens with the marks and logos of VE Solutions." *Id*. ¶ 56. At the same time, the defendants had been developing their own kiosk, the VE Product, to

16

compete with the Integrated Product. *Id*. ¶¶ 4, 43–46, 53–54, 62. "In the Summer of 2024, using USConnect's Affiliate list, Vendors Exchange approached at least one . . . USConnect Affiliate and offered to sell them the VE Product." *Id*. ¶ 64.

While both *Micro/sys, Inc.* and *Agence French Presse* involved allegations of copyright infringement, which this matter does not, the fact remains that Vendors Exchange allegedly acted as the defendants did in both of those cases: representing authorized access to and/or ownership of a good, the USConnect System, contained within a tangible product, the VE Product (kiosk), that Vendors Exchange actually produced.

Because USConnect has failed to allege sufficiently a claim for passing off, the Court should grant the defendants' motion as to Count Five.

C. USConnect's claims regarding unfair and deceptive business survive the pleading stage.

USConnect alleges that the defendants' "replacing [of] the USConnect Trademark images on the Integrated Product's user interface screens with the marks and logos of VE Solutions" is unfair competition in violation of North Carolina common law. Compl. ¶ 117. USConnect also alleges that the defendants' "wrongful conduct" constituted unfair and deceptive trade practices. *Id*. ¶ 120.

1. Unfair or deceptive trade practices defined.

"To state a claim for unfair and/or deceptive trade practices, the plaintiffs must allege that (1) the defendants committed an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to the plaintiffs' business." *Walker v. Sloan*, 529 S.E.2d 236, 243 (N.C. Ct. App. 2000).

Courts analyze a claim for common law unfair competition the same way as they analyze a claim for unfair and deceptive trade practices under North Carolina General Statute § 75-1.1 ("UDTPA" and "UTPA"). *Distrib. Co. LLC v. Mood Prod. Grp. LLC*, No. 24CVS000619-100, 2024 WL 4298296, at *6 (N.C. Super. Ct., Bus. Ct. Sept. 26, 2024).

"It has been said that because '[p]roof of unfair or deceptive trade practices entitles a plaintiff to treble damages,' a UTPA count 'constitutes a boilerplate claim in most every complaint based on a commercial or consumer transaction in North Carolina.'" *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 347 (4th Cir. 1998) (quoting and citing *Allied Distribs., Inc. v. Latrobe Brewing Co.*, 847 F. Supp. 376, 379 (E.D.N.C. 1993)). "To correct this tendency, and to keep control of the extraordinary damages authorized by the UTPA, North Carolina courts have repeatedly held that 'a mere breach of

17

contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under [the UTPA,] N.C.G.S. § 75-1.1.'" *Broussard*, 155 F.3d at 347 (citing cases) (alteration in original).

Thus, a practice is "unfair [under UDTPA] if it offends established public policy, is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, or amounts to an inequitable assertion of . . . power or position." *Rahamankhan Tobacco Enters. Pvt. Ltd. v. Evans MacTavish Agricraft*, Inc., 989 F. Supp. 2d 471, 477 (E.D.N.C. 2013) (internal quotation and citation omitted) (citing cases). The circumstances must be "egregious or aggravating." *Id.* at 478. "Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court." *Kelly v. Ga.–Pac., LLC*, 671 F.Supp.2d 785, 799 (E.D.N.C. 2009) (collecting cases).

> 2. Parallels between unfair trade practice and theft of trade secret claims under state law.

In its withdrawn R&R, the Court found that the defendants' alleged conduct did not meet the first prong of an unfair trade practice claim, as it was not alleged in the Complaint to "'offend[] established public policy,'" nor constitute conduct "'immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.'" *See Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 975 (4th

Cir. 1997) (quoting *Marshall v. Miller*, 276 S.E.2d 397, 403 (N.C. 1981)). *See also McGriff Ins. Servs., LLC v. Wilson*, No. 1:23-CV-295, 2025 WL 69073, at *15 (M.D.N.C. Jan. 10, 2025) (citing *Garlock v. Henson*, 435 S.E.2d 114, 115–16 (N.C. Ct. App. 1993)) ("[A] breach of contract may give rise to an unfair and deceptive trade practice when accompanied by egregious or aggravated circumstances.").

USConnect objected, directing the Court's attention to a handful of North Carolina intermediate court opinions, specifically *Medical Staffing Network, Inc. v. Ridgway*, 670 S.E.2d 321, 329 (2009), wherein the North Carolina Court of Appeals held, without further analysis, that "[a] violation of the Trade Secrets Protection Act constitutes an unfair act or practice under N.C. Gen. Stat. § 75–1.1." (citing N.C. Gen. Stat. § 66–146 (2007)).

USConnect argues that by sufficiently alleging a violation of the Trade Secrets Protection Act, it has *de facto* done the same for its unfair and deceptive practices claim.

> 3. Federal courts' treatment of the overlap between the two claims.

At least two federal courts disagree. Specifically, in *Qorvo, Inc. v. Akoustis Techs., Inc.*, No. 1:21-CV-01417-JPM, 2024 WL 5334785, at *1 (D. Del. Oct. 15, 2024), a jury found the defendants liable for violating the federal Defend

18

Trade Secrets Act ("DTSA") and the North Carolina Trade Secrets Protection Act ("NCTSPA"). But the jury found the defendants did not violate the North Carolina UDTPA. *Id.* The plaintiff moved the district court to amend the judgment to reflect a finding of liability on the UDTPA claim, arguing that "that the jury's findings on the DTSA and NCTSPA—different laws with different elements—entitle them to the same verdict under the UDTPA given the distinguishable findings of three North Carolina Courts[,]" *see id.* at *2, effectively the same argument USConnect advances here.

The district court disagreed, finding that violation of the NCTSPA and DTSA did not, *per se*, compel the finding that the conduct met the second and third elements of an UDTPA violation – affecting interstate commerce and causation. *Id.* at *3.

In *Legacy Data Access, LLC v. MediQuant, Inc.*, No. 3:15-CV-00584-FDW-DSC, 2017 WL 6001637, at *15 (W.D.N.C. Dec. 4, 2017), a jury found the defendant liable for violating the NCTSPA; the plaintiff moved the court, post-verdict, to amend the judgment to reflect a finding of liability on its unfair and deceptive practices claim, as well, arguing that a violation of the former was a violation of the latter "as a matter of law." The district court, sitting in diversity and applying North Carolina law, disagreed.

In so doing, it noted that the "highest court in North Carolina has not determined whether misappropriation of trade secrets is an 'unfair or deceptive' act or practice as a matter of law," and while the appellate court in *Medical Staffing Network, Inc.* (the case the plaintiff cited in support) so found, the district court noted that "the Court of Appeals cited section 66-154(b) of the North Carolina General Statute for this proposition, which addressed violations under Article 23—not Article 24 where NCTSPA is codified." *Id.* at *16.

To that end, in *Drouillard v. Keister Williams Newspaper Services, Inc.*, 423 S.E.2d 324, 326 (N.C. Ct. App. 1992), the court found that "*[i]f* the violation of the Trade Secrets Protection Act satisfies [the] three prong test, it would be a violation of N.C. Gen. Stat. § 75-1.1." (emphasis added). "*Drouillard*, thus, suggests that there is no per se rule that a violation of the NCTSPA is an unfair or deceptive act or practice under N.C. Gen. Stat. § 75-1.1(a)." *Legacy Data Access, LLC*, 2017 WL 6001637, at *16.

The district court in *Legacy Data Access, LLC* did not rely wholly upon this line of reasoning, though. Rather, it then examined the (few) instances where the North Carolina Supreme Court determined that "a violation of another North Carolina statute constitutes a violation of section 75-1.1 as 'a matter of law.'" *See id.* at *16

19

(discussing cases). These cases "involved regulatory statutes that did not create private causes of actions but specifically defined unfair or deceptive trade practices in the applicable industry or disallowed conduct to protect the consuming public." *Id.* (citing *Winston Realty Co. v. G.H.G., Inc.*, 331 S.E.2d 677, 681 (N.C. 1985) and *Pearce v. Am. Defender Life Ins. Co.*, 343 S.E.2d 174, 179 (N.C. 1986)).

This led the *Legacy Data Access, LLC* court to conclude that, contrary to the plaintiff's assertion, "there is no per se rule that a violation of the NCTSPA is an unfair or deceptive act or practice under N.C. Gen. Stat. § 75-1.1," and so that court declined to adopt one. *Id.* The Fourth Circuit affirmed this aspect of the judgment: that is, that the plaintiffs had not proven the interstate commerce element of UDTPA. *See Legacy Data Access, LLC v. Cadrillion, LLC*, 889 F.3d 158, 170–71 (4th Cir. 2018).

And this makes sense: the North Carolina Supreme Court has not weighed in on the issue, nor have its appellate courts uniformly made such a finding.

That being said, courts in this Circuit have found a sufficient overlap between misappropriation of trade secrets and a violation of UDTPA to allow both claims to proceed if one can survive a dispositive motion. *See McGriff Ins. Servs., LLC v. Wilson*, No. 1:23-CV-295, 2025 WL 69073, at *15 (M.D.N.C. Jan. 10, 2025) (denying

summary judgment on the UDTPA claim because of "substantial evidence of fraud" and noting that "fraud is usually sufficient to support a conclusion that an action was unfair or deceptive as is a violation of the TSPA"); *Dental Care Leasing, LLC v. Miller*, No. 7:19-CV-46-BO, 2019 WL 3822511, at *5 (E.D.N.C. Aug. 14, 2019) (finding without specific analysis of the UDTPA factors that because the plaintiffs plausibly alleged that the defendant "breached the redemption agreement, infringing any trademarks, [and] misappropriated any trade secrets," they had sufficiently alleged a UPDTA violation).

4. USConnect's allegations.

Ultimately, though, the issue presented is whether the Complaint alleges facts that meet the elements of an *unfair and deceptive practice claim*, not a Trade Secrets Protection Act claim: (1) the defendants committed a deceptive practice (2) in or affecting commerce that (3) proximately caused actual injury to USConnect's business. *See Walker*, 529 S.E.2d at 243.

In its Complaint, USConnect specifically identifies one offending act – the defendants' replacement of USConnect's marks with their VE Solutions mark. *See* Compl. ¶ 117. That conduct merely supported a breach of contract allegation. *See Canady*, 109 F.3d at 975 (finding that a "breach of contract, even if intentional, is not sufficient[]" to state

20

a claim for unfair and deceptive trade practices under North Carolina law).

In its objections to the original R&R, though, USConnect argues that it also pled the defendants' knowing concealment of its breach to prevent USConnect from taking steps to protect its intellectual property. *See* Pl. USConnect, LLC's Objs. to the Mem. Op. & R. & R., Docket Entry 24, at 5; *see also* Resp. Br. at 19–20. And, indeed, in the UDTPA context, "[e]xamples of such aggravating and egregious behavior include: (1) lying and concealing a breach combined with acts to deter further investigation; and (2) intentional deception for the purpose of continuing to receive the benefits of an agreement." *Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 121 (4th Cir. 2021). *See also Garlock v. Henson*, 435 S.E.2d 114, 115 (N.C. Ct. App. 1993) (finding the defendant's actions "sufficiently aggravating" to show unfair and deceptive practices where, for three years, he "repeatedly denied the sale of the bulldozer when he knew it had been sold" and he "forged a bill of sale in an attempt to extinguish [the] plaintiff's ownership interest in the bulldozer").

Specifically, USConnect alleges that "in or around 2023" Vendors Exchange began devising its plan to create a competing product using USConnect trade secret information, Compl. ¶ 43, and, in "the Spring of 2024," Vendors Exchange attempted to conceal its wrongdoing by

"engag[ing] in discussions with USConnect about extending the MSA for another four (4) year term," *id.* ¶ 61. "While those discussions were ongoing, [the defendants] were in the final stages of integrating numerous programs into [the VE Product]." *Id.* ¶ 62. At the same time, they also "devised a plan to market and sell the VE Product directly to USConnect's Affiliates[.]" *Id.*

As to the second and third elements of a UDTPA claim, USConnect alleges in summary fashion that the conduct is in or affecting commerce and caused injury. *See* Compl. ¶¶ 120, 122.

In light of the generous pleading standard, within-district precedent finding that the fraud giving rise to NCTSPA violations supports UDTPA violations, and binding precedent suggesting this form of lulling can be a deceptive trade practice, USConnect's UDTPA claim may move forward to the discovery stage.

And the economic loss doctrine does not bar that. "In general, the doctrine provides that a mere breach of contract does not ordinarily give rise to a tort action by promisee against promisor." *ITW Charlotte, LLC v. ITW Com. Constr., N. Am.*, No. 3:17-cv-00473-FDW-DCK, 2017 WL 6542511, at *3 (W.D.N.C. Dec. 21, 2017) (citing *Severn Peanut Co. v. Indus. Fumigant Co.*, 807 F.3d 88, 94 (4th Cir. 2015)). "North Carolina's economic loss doctrine . . . prohibits recovery for purely economic loss in tort when a contract, a warranty, or

the UCC operates to allocate risk." *Severn Peanut Co.*, 807 F.3d at 94 (internal quotations and citations omitted). Thus, "[t]o state a tort claim and breach of contract claim arising from the same actions, a plaintiff must allege a duty owed him by the defendant separate and distinct from any duty owed under a contract." *Schumacher Immobilien Und Beteiligungs AG v. Prova, Inc.*, No. 1:09cv00018, 2010 WL 3943754, at *2 (M.D.N.C. Oct. 7, 2010) (internal quotation and citation omitted) (citing cases).

However, the doctrine is not an automatic bar to any tort claim arising from conduct that also breached a contract between parties. *See Broussard*, 155 F.3d at 346 ("In recognition of the fundamental difference between tort and contract claims, . . . North Carolina has recognized an 'independent tort' arising out of breach of contract only in 'carefully circumscribed' circumstances."). The "tortious conduct must also be accompanied, however, by a sufficient aggravating element such as fraud, malice, reckless indifference, oppression, insult, or willfulness." *ITW Charlotte, LLC*, 2017 WL 6542511, at *3 (citing cases).

Here, USConnect alleges breach of contract based on Vendor Exchange's improper use and dissemination of information provided pursuant to three written contracts. *See* Compl. ¶¶ 78–85. Its UDTPA claim relies upon the specific value of that

information pursuant to its alleged trade secret status, as well as the aforementioned lulling conduct. *See* Compl. ¶¶ 61–62; 93–108; 120–21. As alleged, the lulling in and of itself can constitute willful behavior on the part of the defendant.

The Court should deny the defendants' motion to dismiss Counts Six and Seven.

> D. USConnect has appropriately alleged unjust enrichment in the alternative.

USConnect alleges that it "conferred benefits upon [the defendants] in the form of the USConnect IP and USConnect Confidential Information," the defendants "consciously accepted those benefits," and USConnect did not confer them gratuitously. Compl. ¶¶ 125–26. The defendants argue that the presence of express contracts dooms this claim. Am. Br. in Supp. at 26. They recognize, though, that an unjust enrichment claim and a breach of contract claim may be alleged in the alternative. *Id.* The defendants assert, "Here, neither party disputes the validity of the MSA." *Id.* Because there is no dispute about the existence of a contract, they argue that the plaintiff should not be able to pursue its unjust enrichment claim. *Id.*

"The fact that a plaintiff cannot simultaneously recover damages for both breach of an express contract and unjust enrichment does not preclude the plaintiff from pleading

22

both theories in [its] complaint." *Hill v. AQ Textiles LLC*, 582 F. Supp. 3d 297, 322 (M.D.N.C. 2022) (citations omitted). "Until the existence of an express contract is proven, [a plaintiff] is allowed to plead *quantum meruit* and unjust enrichment as alternative theories of recovery [to breach of contract]." *Performance Sales & Mktg., LLC v. Lowe's Cos., Inc.*, No. 5:07CV140, 2010 WL 2294323, at *5 (W.D.N.C. June 4, 2010).

Here, the defendants merely admit the plaintiff sufficiently alleged a breach of contract and, through counsel, state in their brief that "neither party disputes the validity of the MSA." But more is needed for the plaintiff ultimately to recover under its breach of contract claim. Therefore, at this stage, the Court should deny the defendants' motion as to Count Eight.

## IV. CONCLUSION

It is therefore **ORDERED** that the Memorandum Opinion and Recommendation of United States Magistrate Judge, Docket Entry 22, dated March 9, 2026, is **WITHDRAWN.**

It is further **RECOMMENDED** that the Court grant in part and deny in part the defendants' Motion to Dismiss, in that the Court should grant in part the Motion to Dismiss as to Count Five, dismissing that claim, and otherwise deny the Motion.

_____
JoAnna Gibson McFadden
United States Magistrate Judge


May 22, 2026
Durham, North Carolina